[L.A. No. 32014. Sept. 19, 1985.]

MICHAEL U., a Minor, etc., Plaintiff and Respondent, v.
JAMIE B., a Minor, etc., et al., Defendants and Appellants.

JAMIE B., a Minor, etc., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MICHAEL U., a Minor, etc., Real Party in Interest.

## COUNSEL

Christian R. Van Deusen for Defendants and Appellants and Petitioner.

David Keene Leavitt as Amicus Curiae on behalf of Defendants and Appellants.

Winfield S. Payne III and Michael D. Maddy for Plaintiff and Respondent and Real Party in Interest.

No appearance for Respondent Court.

## OPINION

**BROUSSARD, J.**—This case concerns the custody of Eric, the infant son of Michael U. and Jamie B. Eric has been placed for adoption with Mr. and Mrs. Glenn White. Michael, the natural father, sought temporary custody of Eric, which would enable him to qualify as a "presumed father" under Civil Code section 7004 and thus, by withholding his consent, to prevent the proposed adoption (see Civ. Code, § 7017, subd. (d)). Jamie and the Whites appeal an order granting his request. We granted a hearing to consider whether substantial evidence supported the implied finding of the trial court that an award of custody to Michael would not be detrimental to the

child, and stayed enforcement of the trial court's order pending our decision.

## I.

When Eric was conceived, Jamie was 12 years old and Michael was 16. Both sets of grandparents were informed of the pregnancy. Michael and his family proposed that they raise the child, but Jamie and her parents preferred that the child be adopted by a married couple.

Eric was born on April 27, 1983. That same day Jamie relinquished the child to the LDS Social Service Agency for adoption. Michael and his mother were notified of the birth two days later. (The evidence is in dispute whether they offered to pay a portion of the maternity costs.)

Michael saw his son briefly in May at the LDS Social Service Agency but when he refused to consent to an adoption he was denied further contact. Michael's mother, Linda U., then obtained an ex parte order appointing her temporary guardian of Eric, but was unable to locate the adoptive parents to serve the order.

Jamie reclaimed Eric from the agency, and placed him with the Whites for adoption on June 27, 1983. When Michael again refused to consent, the Whites and Jamie filed a petition under Civil Code section 7017 to terminate Michael's parental rights. He responded with a petition to establish paternity and an order to show cause with respect to custody and visitation. The court put the section 7017 proceeding off calendar, conducted a hearing in which it inquired into the effect upon Eric of an award of custody to Michael, and entered an order awarding him temporary custody, with visitation rights for Jamie. Jamie and the Whites appeal from that order.

## II.

In defining the rights of unmarried fathers, California's Uniform Parentage Act (Civ. Code, § 7000 et seq.) distinguishes between a "presumed father" and one who is merely a "natural father." Civil Code section 7004 explains that a man may qualify as a "presumed father" in any of several ways.[1] Most of the listed conditions refer to actual or attempted marriage;

---

[1]For convenience we shall use the term "presumed father" to mean a man who qualifies under section 7004, and "natural father" to mean one who does not. The statutes, however, use more cumbersome wording, distinguishing between a natural father who is a presumed father, and a natural father who is not a presumed father.

the only one relevant to the present case is condition 4: "He receives the child into his home and openly holds out the child as his natural child."[2]

Michael is a natural father, not a presumed father, because he has not yet received Eric into his home.[3] (*In re Reyna* (1976) 55 Cal.App.3d 288, 301 [126 Cal.Rptr. 138].) If, however, he actually acquired physical custody, he could receive Eric into his home and thereby acquire the status of a presumed father. (*In re Tricia M.* (1977) 74 Cal.App.3d 125, 135-136 [141 Cal.Rptr. 554]; *In re Reyna, supra,* 55 Cal.App.3d 288, 301.) The consent of a presumed father is essential to an adoption. (Civ. Code, § 7017, subd. (d).) Thus the present controversy, although nominally about the temporary custody of Eric pending the adoption proceeding, will probably determine the fate of the proposed adoption.

### III.

Our recent decision in *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918], settled the appropriate standard for resolving a custody dispute between a natural father and prospective adoptive parents. Our decision looked first to Civil Code section 4600, enacted as part of the Family Law Act of 1969. That section, we noted, "sets forth a mandate that custody of a child in a dissolution proceeding could not be awarded to nonparents without both parent's consent or a finding 'that an award of custody to a parent would be detrimental to the child.'" (Pp. 69-70.)

Next we turned to *In re B.G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], the leading decision construing section 4600. That decision, we noted in *In re Baby Girl M., supra,* 37 Cal.3d at page 70, concluded that "'section 4600 expressly recognizes that custody should be awarded to parents in preference to nonparents. As between parents, it permits the court to award custody "according to the best interests of the child," but in a dispute between a parent and a nonparent, the section imposes the additional stipulation that an award to the nonparent requires a finding that "an award of custody to a parent would be detrimental to the child."' (*Id.,* at p. 698.) 'There can be no question of the desirability of a uniform rule; the Legis-

---

[2]The Uniform Parentage Act carefully avoids the terms "legitimate" and "illegitimate." Condition 4 in section 7004, however, is based on the common law concept of legitimation by reception of the child into the father's family, previously codified in former Civil Code section 230.

[3]In *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122], the father argued a theory of "constructive receipt," claiming that since the mother had prevented him from receiving the child into his home, he should qualify as a presumed father without proving actual receipt. The court disagreed, stating that "[t]he cases have recognized that a mother may, by her conduct, prevent a natural father from securing even the minimal contact with the child that old section 230 required." (P. 630.)

lature's specification that section 4600 applies to "*any proceeding where there is at issue the custody of a minor child*" demonstrates that section 4600 was enacted to fulfill that objective.' (*Id.*, at p. 696, fns. omitted, italics added.)"

We concluded that: "A natural father may not have *initial* custodial or veto rights equal to those of a presumed father. However, both classes of fathers share the same *burdens* of support for the child and liability for the reasonable expenses of the mother's pregnancy and confinement. ([Civ. Code,] §§ 7010 and 7012.) Thus when the natural father's rights *do* arise, upon relinquishment by the mother, and he claims custody at a section 7017 hearing, an additional finding of detriment is necessary to terminate his parental rights." (P. 75.)

As summarized in *Adoption of Baby Boy D.* (1984) 159 Cal.App.3d 8 [205 Cal.Rptr. 361], "when a nonpresumed natural father claims custody to his child in opposition to petitioning adoptive parents, pursuant to section 7017, and the doctrine of parental preference is applied, the court must find that an award of custody to the father would be detrimental to the child and leaving custody with the prospective adoptive parents is in the child's best interest in order to terminate the natural father's rights and proceed with the adoption. (Civ. Code, § 4600, subd. (a); *In re B.G.*, *supra*, 11 Cal.3d 679, 699.) Should the court fail to find detriment, the natural father will gain *pendente lite* custody of the child and a consequent voice in the child's future. Whether viewed as obviating the need for an adoption (*W. E. J.* v. *Superior Court*, *supra*, 100 Cal.App.3d 303, 311 [160 Cal.Rptr. 862]) or as providing the natural father with the opportunity to qualify as a presumed father under subdivision (a) of Civil Code section 7004 (*In re Tricia M.*, *supra*, 74 Cal.App.3d 125, 136; see also *In re Reyna*, *supra*, 55 Cal.App.3d 288, 301), the father has gained all that he sought." (Pp. 23-24.)

## IV.

Although custody is a special proceeding, statutory and decisional law nevertheless require findings of fact when requested by a party. (*In re Rose G.* (1976) 57 Cal.App.3d 406, 416-418 [129 Cal.Rptr. 338].) The substitution of a "statement of decision" for "findings of fact" under the 1977 amendment of Code of Civil Procedure section 632 works no significant change; the court still must address the essential findings required by Civil Code section 4600 if requested by a party.

In the present case, however, the parties did not request a statement of decision or findings of fact. Under these circumstances, all intendments favor the ruling below (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110

P.2d 58]), and we must assume that the trial court made whatever findings are necessary to sustain the judgment. (See *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 984 [147 Cal.Rptr. 22] and cases there cited.) In this case, the essential finding is that an award of custody to Michael would not be detrimental to Eric.

 Consequently, the only issue before us is whether substantial evidence supports that implied finding. The only significant dispute in the evidence relates to the efforts of Michael and his mother to contact Eric, to obtain custody of him, and their offer to pay part of the maternity expenses. Resolving that conflict in support of the trial court, we may fairly conclude that Michael and his mother made reasonable efforts to maintain contact with Eric and to participate in the care of the child.

The record, however, contains uncontroverted evidence which indicates that Michael lacked the maturity needed to care for a child and that to award custody of Eric to Michael, after he has established a bond with the Whites, would be detrimental.[4]

Jamie was 12 years old when Eric was conceived—and the fact that Michael had intercourse with a 12-year-old girl itself shows poor judgment and lack of maturity. Jamie testified that one week after the discovery of her pregnancy, Michael told her he was having intercourse with a 16-year-old girl, but that he had told her to get the pill so that she would not become pregnant like Jamie had. On another occasion, he told Jamie that he had had intercourse with his new girlfriend's 14-year-old sister while she was under the influence of marijuana. Jamie added that he smoked marijuana on several occasions when he was with her.[5]

---

[4]The dissenting opinion sets out the evidence showing that Michael wants to obtain custody of Eric and the efforts that he and his mother made to obtain custody. But the fact that a natural father seeks custody does not indicate that an award of custody to him will not be detrimental to the child. There is a lack of evidence that Michael—as distinguished from his mother and her housekeeper—has the maturity to care for a child.

[5]Jamie also testified that her relinquishment of Eric was predicated on the belief that the child would be adopted and that Michael would not gain custody. She relinquished Eric for adoption in order to give him the opportunity to be raised by two mature adults who could properly care for him. The record shows her expressed desire to keep Eric if the only alternative would be releasing him into Michael's custody. Her mother also expressed a desire to bring Eric into their home should the court refuse to terminate Michael's parental rights.

The mother in the case of *Adoption of Baby Boy D., supra,* 159 Cal.App.3d 8, testified in a similar vein. Discussing that testimony, the court commented that "[w]hile this testimony would support a finding she had asserted a contingent claim to custody, no such finding was made and the proceeding below was not conducted in that posture. Unless and until [the mother] unmistakably asserts her right to custody, [the father's] claim must be considered to be in opposition to [the adoptive parents'] claim, i.e., a parent versus nonparent contest in which the court is required to find detriment in order to deny [the father] custody." (P. 22.)

Gary Holman, Michael's school counselor, testified that Michael had serious academic difficulties. He did not have sufficient academic credits to graduate with his class, and was attempting to acquire sufficient credits through home study supervised by a continuing high school education program.

Michael Cook, the dean in charge of discipline at Serrano High School, said he had become acquainted with Michael through frequent discipline visits. He described Michael as "very defiant. I would say very immature, disruptive, lack of respect for authority." Michael was involved in numerous fights at school, defied school regulations, and was dismissed from the football team because of fighting. Michael left school at least twice and was "in and out of Serrano at different times." He received a social promotion from the eighth grade after spending two years at that level.

Michael was 16 years old and in the 9th grade when Eric was conceived.[6] He was living at home with his parents and his younger brother. Michael testified that he was not employed, but had previously worked as a busboy and waiter. He was attempting to get the credits to graduate from high school and was taking courses at a community college. Conscious of his lack of experience at "fathering," he had taken a community college course in child development. When asked by counsel whether he loves his son, Michael replied, "Yes, I do, from what I saw of him."

Linda U., Michael's mother, described their family life, said she would care for Eric when Michael was away, and had arranged with a housekeeper to come over when she was at work. Indeed, the gist of Michael and Linda's testimony, as well as the argument of counsel, supported placement of Eric in a family setting with Linda assuming principal responsibility for his care. Counsel made no attempt to show that Michael could provide suitable care on his own, and in closing argument suggested that if Michael ceased to live with his mother in the family residence, another change in custody might be necessary.

The Whites testified briefly. They are a married couple with a three-year-old adopted daughter. Glenn White is a fireman, Gayle is a homemaker. At the time of trial they had cared for Eric for about five months, and he

---

[6]Jamie and the Whites point out that Michael is an unemancipated minor who could not legally establish his own residence, contract for medical care for Eric, or contract for child care. (See Civ. Code, § 63.) It is clear that the statutes do not prohibit the award of custody to an unemancipated minor. While a court could take into account the legal disabilities of an unemancipated minor in assessing the best interest of a child and the possible detriment arising from a custody award to the minor, we are dealing with a subject in which practical considerations, emotional ties, and psychological impact all tend to be more important than such legal disabilities.

appeared to be developing normally and happily. No one here questions the Whites' suitability as parents.

Dr. Irving Gislason, a child psychiatrist, testified that Eric had established an emotional attachment to the Whites, and that to remove him from their home would be detrimental.[7] He would experience anaclitic depression, which is characteristically "tension, protest, generally poor emotional development, failure to thrive and increased susceptibility to infections." While temporary depression and anxiety would be inevitable, the long-term effects are less predictable, but a critical psychological event of the first year of life is the development of trust, and interference with that development increases the probability of adult psychological disorders. Dr. Gislason had not examined Michael, but in response to a hypothetical question stated that in his opinion Michael had a "moderate to marked amount of immaturity in reference to necessities that [the child] would need." On cross-examination he acknowledged that if Eric remained with the Whites, he might as an adolescent suffer emotional trauma from the knowledge that he was adopted and that the adoption had prevented him from having a relationship with his natural father.

### V.

If this case could be decided solely on the basis of the best interest of Eric, it would not be a close case. On this record we could not possibly justify taking Eric from the stable and loving home where he now lives. Michael, however, is entitled to the parental preference established by Civil Code section 4600, and to custody unless such an award would be detrimental to the child.

Even under this higher standard, however, we conclude that under the undisputed evidence we should reject the trial court's award of custody to

---

[7]Judicial decisions have recognized the harm to a child which results when he is removed from a stable home environment. (See *Marriage of Carney* (1979) 24 Cal.3d 725, 730-731 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028] and cases there cited.) In *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699 [117 Cal.Rptr. 856, 84 A.L.R.3d 654], the court took judicial notice of the book Beyond the Best Interests of the Child by Goldstein, Freud & Solnit (1973), which "emphasizes the importance to a child of continuity of parental relationships. According to the authors, changes or interruptions in this relationship cause the child to regress 'along the whole line of his affections, skills, achievements, and social adaption.' (*Id.,* at p. 18) 'Physical, emotional, intellectual, social and moral growth does not happen without causing the child inevitable internal difficulties. The stability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in the external world are added to the internal ones' (*id.,* at p. 32)." (P. 706.) The court concluded with a quotation from *Williams* v. *Neumann* (Ky.App. 1966) 405 S.W.2d 556, 557: "'[A child] cannot be suddenly transplanted like a dogwood tree without running serious and dangerous risk of frustration and bewilderment.'" (P. 707.)

Michael. Michael was an unemployed high school student whose social and sexual relationships and academic record demonstrate his lack of maturity and judgment. His ability to care for the child himself was open to question. We recognize that at the time of trial Michael was living with his family in an established and loving family relationship, but the award of custody is to Michael himself, and upon reaching majority he would be entitled to leave and take the child with him. Yet the act of changing custody would itself inflict serious harm on Eric, and if, as seems quite possible, Michael proves unable to care for Eric properly and further changes are required, that initial custody change would still have conferred on Michael a permanent right to veto any proposed adoption. We conclude that the implied finding that an award of custody to Michael would not be detrimental to Eric is not supported by substantial evidence, and that the court's order awarding Michael temporary custody of Eric was an abuse of discretion.[8]

We therefore remand the matter for a new custody hearing. We recognize that during the pendency of this appeal additional circumstances may have developed which bear upon the determination of the issues involved. "Any such circumstances may, of course, be considered by the trial court on remand." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 741 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]; *In re Baby Girl M., supra,* 37 Cal.3d 65, 76.)

The order awarding temporary custody to plaintiff Michael U. is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.

Grodin, J., concurred.

**KAUS, J.**— I concur. The lead opinion reaches what I believe to be the only result which comports with justice. Yet, after reading Justice Reynoso's dissent, I cannot help having some misgivings that—given the "detriment" standard—the lead opinion comes close to impinging on the substantial evidence rule.

The more I think about it, the more certain I am that the trouble with this case is not so much the factfinding process, but this court's unfortunate

---

[8]We do not imply that Michael is "unfit" in the sense that, if he received custody of Eric, the state would have grounds to intervene and remove the child. As the court explained in *In re Reyna, supra,* 55 Cal.App.3d 288, 302, the concept of unfitness under Civil Code section 232 or Welfare and Institutions Code section 300 is distinct from the test of detriment under Civil Code section 4600. It is presumably detrimental to a child to award custody to a parent who is so unfit that the state might have to intervene to retrieve custody, but it might also be detrimental to place him with a parent who is not unfit, depending upon the child's current circumstances and the available placement alternatives. (*In re Reyna, supra,* 55 Cal.App.3d at pp. 302-303.)

misstep in *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918]. The sooner we rectify that mistake, the better. Applying the standard which ought to govern—"what disposition is in the best interests of the child?"—there can be no question that the lead opinion has reached the correct result.

**MOSK, J.**—I concur in the judgment, but do not agree with the majority's implicit perpetuation of an erroneous standard by which to determine critical issues of custody and adoption.

*In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918], established, by a divided decision of this court, that a casual inseminator could be declared a presumed father under the law and thus have the power to frustrate the unmarried mother's consent to adoption of her child by a qualified family and prevent the child from being reared in an environment with loving adoptive parents.

This dramatically illustrates the fallacy of any test other than the best interest of the child. *Baby Girl M.* requires a finding that custody in the biological father would be detrimental to the child in order to deny him the same rights as a legally presumed father. Interpreting the *Baby Girl M.* test, the same Court of Appeal justice who authored that opinion for a majority of this court concluded, in the Court of Appeal in this case, that it would *not* be detrimental to give custody of the infant to a 16-year-old biological father who was legally a rapist: as a juvenile delinquent who admittedly had sexual relations with a 12-year-old girl, the father could have been criminally prosecuted. (Pen. Code, § 261.5.) Apparently it now takes something more in a biological father than his attributes as an irresponsible and immature juvenile, a delinquent with no visible means of support and frequent criminal activity, to constitute circumstances detrimental to the well-being of an infant.

While the majority manage to save this child by invoking a theory of abuse of trial court discretion, under these egregious circumstances that result is merely a palliative. We should reconsider the *Baby Girl M.* decision before it does any more potential damage to the welfare of children and to the previously accepted orderly process of adoption. We should return to the traditional rule: when there is an unmarried mother who proposes to place her child for adoption, and a biological but not presumed father, the trial court should consider only the best interest of the child.

Lucas, J., concurred.

**REYNOSO, J.**—I respectfully dissent.

The majority subscribes to an unfortunate opinion. Unfortunate, for it teaches recalcitrant parties that by hiding a child and not permitting parental

contact, they may succeed in taking all rights from that parent. And unfortunate, for the majority substitutes its judgment for that of the trial court judge who heard the witnesses and made the always difficult decision. Unfortunate finally, because the standards the Legislature has established (Civ. Code, § 4600) and our own guidelines (*In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918]) have been weakened, bringing uncertainty to the law.

### 1. *Substantial Evidence Supports the Trial Court Decision*

As the majority notes, the only issue presented by this case is whether substantial evidence supports the trial court's implied finding that an award of custody to Michael would not be detrimental to Eric. (Civ. Code, § 4600, subd. (c).) The law is well settled with respect to the standards to be applied by an appellate court in determining whether there is substantial evidence to support a trial court ruling. As I have indicated, the majority has ignored this precedent and substituted its judgment for that of the trial court.

In determining whether a trial court ruling is supported by substantial evidence, the reviewing court "must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (6 Witkin, Cal. Procedure (2d ed.) § 245, p. 4236; see cases cited therein.) The rule is the same even where the weight of the evidence goes against the prevailing party. Substantial evidence review "does not permit weighing of the evidence or reversal of a judgment in accordance with the preponderance thereof. A judgment against the weight of the evidence will be affirmed, provided the record is free from prejudicial error, if there is substantial evidence in support of it." (*Id.,* § 248, p. 4240.)

"The testimony of a single witness, even the party himself, may be sufficient" to constitute substantial evidence. (*Id.,* § 248, p. 4240.) The rationale for this rule is that the trial court, as the trier of facts, is in the best position to assess the credibility of the witnesses. " 'There are many factors aiding in a reasonable conclusion which are presented to the trier of facts in the first instance and not available to one going over the cold record. There is what might be called the "feel" of the case. This embraces a consideration of the witnesses, the manner in which they testify and their general attitude in the courtroom.' (*Cummings* v. *Kendall* (1940) 41 Cal.App.2d 549, 555.)" (*Id.,* § 246, p. 4239.)

The majority concludes that "[t]he record . . . contains uncontroverted evidence which indicates that Michael lacked the maturity needed to care for a child and to award custody of Eric to Michael, after he has established

a bond with the Whites, would be detrimental." (Maj. opn. at p. 793, *ante.*) In my view, the evidence relevant to this issue is quite controverted. The majority is very selective in its use of the record. The following substantial evidence was presented to support the trial court's ruling.

The record indicates that Michael exhibited responsibility for the pregnancy from the outset. At his suggestion, Michael and Jamie together sought pregnancy testing and counseling from a community social service agency. Moreover, Michael took the responsibility for informing Jamie's parents of the pregnancy, to ensure that Jamie and the baby received proper medical attention.

While Michael's contact with Jamie diminished thereafter, this was clearly due to the fact that school authorities had "ordered" Michael not to have any contact with Jamie, at the risk of "get[ting] into very deep trouble." Jamie's mother testified that this directive was made at her and her husband's "instruction." Additionally, Jamie was sent to live with her aunt on January 1, 1983, and thereafter came home only every other weekend.

Michael testified that he wanted to keep his baby from the moment he knew Jamie was pregnant, and had expressed to Jamie his desire to be present at the baby's birth. Michael later made efforts to identify the hospital in which Jamie would deliver. Although, as the majority notes, the evidence is in dispute regarding whether Michael and his family offered to pay for the delivery, Jamie's mother testified that her family incurred no costs associated with Eric's birth as it was covered under their existing Kaiser insurance.

Prior to Eric's birth, Michael sought individual counseling. Michael first spoke with a priest, from whom he sought spiritual guidance and help in obtaining custody of his child. He then turned to a high school counselor, who referred Michael to the county in order to pursue obtaining custody of his child. Michael and his mother thereafter talked with a county official, who suggested they see a lawyer. As a result of consulting with a lawyer, Michael's mother obtained temporary guardianship of Eric shortly after his birth.

Both before and after Eric's birth, Michael and his mother repeatedly indicated to Jamie and her mother that they wanted to raise the child. Since Eric's birth, Michael and his mother have been undaunted in their efforts to acquire custody of Eric, notwithstanding the fact that they have been denied contact with and information about Eric.

The record indicates that Michael can provide a stable and loving home for his child, full of warmth and nurturance. Michael and his mother both

described their extended family as "close" or "tight" knit. His maternal grandmother and aunts live close by and the extended family gets together frequently for family occasions and holidays. The individual selected by Michael and his mother to provide regular child care, Rose Chacon, is a family friend, a middle-aged woman who has raised five children, has five grandchildren, and lives three and a half miles from Michael's home, where she intends to care for Eric. Michael's home is large, with three bedrooms, two-and-a-half bathrooms, and large kitchen, dining room and living room. Michael himself is prepared to assume many of the responsibilities associated with Eric's care. In addition to taking a course in child development, Michael has had practical experience caring for his sister's two young children, including bottle feeding and diaper changing. Michael has also routinely assumed responsibilities for housework at his home.

At the time of the hearing, Michael was doing well academically. Michael himself—not at the behest of the Serrano High School authorities—had decided to enroll in an independent high school program. Michael was not only pursuing this program, which he intended to complete in June, but was taking some classes at a community college, including the child development course. It was Michael's intention to attend community college on a full-time basis following his graduation from high school.

In my view, this evidence amply supports the trial court's ruling that it would not be detrimental to award custody of Eric to Michael.

*2. Statutory and Decisional Standards on Detriment Support the Trial Court Decision*

In considering the effect of Eric's removal from the White home in its determination whether it would be detrimental to place Eric with Michael, the majority has departed from the precedent of this court's recent decision in *In re Baby Girl M., supra,* 37 Cal.3d 65. The majority erroneously considered the effect of severing the emotional bonds Eric has established with the Whites. While we recognized in *Baby Girl M.* that a child may develop a strong relationship with prospective adoptive parents pending resolution of the natural father's claims (37 Cal.3d at p. 76, fn. 12), such circumstances are properly considered as bearing on the best interests of the child, not the fitness of the natural father (*id.,* at pp. 75-76). Moreover, under *Baby Girl M.,* the trial court is precluded from applying the best interests of the child standard without *first* determining whether granting custody to the natural father would be detrimental to the child. (*Id.,* at p. 75.) " '[T]he [natural] father's opportunity to establish a protected relationship [with his child] must prevail in the absence of his unfitness.' " (*Ibid.,* quoting Buchanan, *The Constitutional Rights of Unwed Fathers Be-*

*fore and After Lehr v. Robertson* (1984) 45 Ohio St. L.J. 313, 373.) As we noted in *Baby Girl M.*, this determination cannot be made by comparing the adoptive family and the natural father. (37 Cal.3d at p. 76.) Thus, the appropriate inquiry is whether awarding custody of a child to his natural father would be detrimental, in and of itself, without considering whether the child's removal from prospective adoptive parents would independently be detrimental.

Accordingly, the majority's reliance on the testimony of child psychiatrist Dr. Gislason is inappropriate to conclude that awarding custody of Eric to Michael would be detrimental. Dr. Gislason interviewed only the Whites. He did not interview Michael and admitted that he had "no direct information" on Michael. Dr. Gislason's "indirect information" about Michael came from the attorneys for Jamie and the Whites. Nonetheless, Dr. Gislason repeatedly voiced his opinion that it would be both detrimental to, and against the best interests of, Eric to be removed from the White home and placed with Michael. These opinions were clearly based on Dr. Gislason's comparison of the two placements, without an independent inquiry into Michael's fitness as a father.

Moreover, at the time of the hearing, when Eric was seven months old and had been with the Whites for four months, Dr. Gislason estimated that Eric would experience two to three months of "reactive attachment disorder" if his placement was changed, and would not necessarily experience any long-term effects. Dr. Gislason conceded that it would be unusual if Eric had not formed such an attachment to the Whites. Significantly, when asked by the trial judge to compare the detriment to a child of being placed with a natural parent after having been with prospective adoptive parents, with the detriment associated with being permanently deprived of a relationship with a natural parent, Dr. Gislason responded that "in the long term, as the child gets to be, you know, a young teenager or adult, that makes a difference, and it would weigh, then in favor of the biological parent."

By relying on the emotional bonds Eric has formed with the Whites in determining whether awarding custody of Eric to Michael would be detrimental, the majority, in effect, penalizes Michael for a lengthy judicial process over which he has had no control. This analysis is not only contrary to *Baby Girl M.*, but is fundamentally unfair to natural parents who, through no fault of their own, have been unsuccessful in obtaining custody of their children.

Since substantial evidence supports the trial court's implicit finding that it would not be detrimental to award custody of Eric to Michael, I would affirm the trial court's order awarding Michael temporary custody of Eric.

Bird, C. J., concurred.