Filed 11/20/13  In re Octavio I. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re OCTAVIO I., JESSIE R., and MARIA R., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B247528 (Super. Ct. No. J1379435) (Super. Ct. No. J1379436) (Super. Ct. No. J1379437) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD PROTECTIVE SERVICES, Plaintiff and Respondent, v. C. R. and O. R., Defendants and Appellants. | |

C. R. (mother) and Octavio R. (father) appeal from a March 7, 2013 order terminating their parental rights to Octavio I. (age 10), Jessie R. (age 9) and Maria R. (age 4), and freeing the children for adoption.  (Welf. & Inst. Code, § 366.26.)[1] Appellants contend that the beneficial parent-child and sibling relationship exceptions preclude the children's adoption.  (§ 366.26, subd. (c)(1)(B)(i) & (v).)  We affirm.

---

[1] All statutory references are to the Welfare & Institutions Code.

1

*Facts and Procedural History*

On July 21, 2010, Santa Barbara County Child Protective Services (CWS) detained Octavio I., Jessie R. and Maria R., and two older sisters (13-year-old G. and 11-year-old Y.) after mother was arrested for transporting and using drugs. The family was living in a garage with no running water and using a bucket as a toilet. The bucket was filled with urine, mattresses and blankets were scattered about, and a dirty diaper was next to a half-eaten plate of food. The garage wreaked of a foul odor and had rotten food in a refrigerator.

CWS filed a dependency petition for failure to protect (§ 300, subd. (b)), alleging that the family had a child welfare history dating back to 2006 with ten referrals for general neglect. Father had a history of using controlled substances and mother's criminal history included grand theft, burglary, false checks/records/certificates, extortion, battery with serious bodily injury, preventing/dissuading a witness/victim, criminal conspiracy, and fighting. Before the children were detained, appellants received 10 months of Voluntary Family Maintenance services but failed to meet case plan objectives.

Appellants submitted on the reports at the August 30, 2010 jurisdiction /disposition hearing and received 12 months of reunification services. On August 22, 2011, appellants reunified with the children, were provided family maintenance services, and resumed using drugs. The older sisters, G. and Y., skipped school, were drinking, and defiant. Appellants neglected Maria and failed to provide Jessie's and Jessie's medical needs.

On July 9, 2012, CWS placed the children with the maternal grandmother and filed a section 387 supplemental petition alleging that appellants were abusing drugs and not maintaining a clean and habitable home. The children were placed in shelter care after the grandmother let appellants have unsupervised contact with the children. On September 13, 2012, CWS placed Maria in a fost-adopt home in Santa Barbara County. Octavio and Jessie were placed in a fost-adopt home in Tulare County on December 6, 2012. The trial court ordered weekly supervised visits with drug testing.

2

Before the jurisdiction/disposition hearing, CWS filed a section 387 supplemental-amended petition alleging that appellants suffered from chronic substance abuse, had tested positive for amphetamines, and were not participating in drug treatment. The petition alleged that appellants left alcohol and prescription medications in easy reach of the children, that debris and dirty dishes were scattered about the house, that the house was littered with trash, and that appellants repeatedly failed to obtain medical care for Jessie and Octavio.

At a September 27, 2012 contested jurisdiction/disposition hearing, the trial court found all the allegations to be true and terminated family maintenance services. The court set the matter for a section 366.26 hearing and ordered supervised visitation with drug testing.

At the section 366.26 hearing, appellants stipulated to an order placing G. and Y. in long term foster care. With respect to the younger children (Maria, Octavio, and Jessie) the trial court conducted a three-day contested hearing in which CWS and CASA reports were received into evidence and the social worker, G., Y., Jessie, Octavio, the maternal grandmother, an aunt, and appellants testified.

A CASA worker reported that Maria blossomed after the fost-adopt placement and was bonded to the foster family. Maria was very close to her foster mother and wanted to be adopted by her. Maria was enrolled in a school and ballet classes, and happy and making new friends. The social worker reported that Maria wanted to be adopted and enjoyed supervised visits with appellants and her siblings, but was happy to return to her fost-adopt home.

A CASA volunteer reported that Octavio and Jessie were best of friends and thriving in their fost-adopt home. The foster parents wanted to adopt and had made significant progress addressing the boys' medical and behavioral problems. Octavio and Jessie missed their older sister (G.) but did not mention the other siblings.

The trial court found that the children were adoptable and that appellants had failed to show that the parent-child or sibling relationship exception applied. With respect to the parent-child relationship exception, it found that appellants lacked insight

3

or parental awareness of the children's needs. With respect to the sibling relationship exception, the trial court found that the siblings were loving and playful during visitation but Maria, Octavio and Jessie had adjusted well to their fost-adopt placements, and not distraught when the visits ended. Maria wanted to be adopted. Octavio and Jessie's foster mother wanted to adopt the boys and said that she was willing to facilitate contact with the siblings and extended family. Based on the strong preference for adoption and speculative evidence of detriment to the children, the trial court found the sibling exception did not apply.

## Standard of Review

We review for substantial evidence and determine whether the trial court abused its discretion in concluding that the parent-child and sibling exceptions were not proven or significant enough to compel a plan other than adoption. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) Where reunification services are terminated, the focus shifts to the needs of the child for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) The purpose of the section 366.26 hearing is to provide stable, permanent homes for dependent children. (§ 366.26, subd. (b).) Adoption is the preferred permanent plan (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573) and appellants have a "heavy burden" of proving that the parent-child or sibling relationship exception overcomes the preference for adoption. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "Because a parent's claim to . . . an exception [to termination of parental rights] is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will chose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

## Beneficial Parent-Child Relationship

Appellants argue that the parent-child relationship exception bars the children's adoption. (§ 366.26, subd. (c)(1)(B)(i).) To establish the exception, appellants must show they maintained regular visitation and contact and the children would benefit from continuing the relationship. (*Ibid.*) The trial court must find that termination of

4

parental rights would be detrimental to the child and considers facts such as (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of the interaction between the parent and the child, and (4) the child's particular needs. (*In re Helen W,* (2007) 150 Cal.App.4th 71, 81.)

Although the visitation prong was satisfied, appellants' relationship with the children did not advance beyond friendly supervised visits. Maria, Octavio, and Jessie were removed from appellants' care for more than 20 months and had bonded to their fost-adopt families. There was no evidence that "severing the natural parent-child relationship would deprive the child of a *substantial* positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

The evidence shows that appellants are unaware of the children's needs, what they were doing in school, or how to interact with the children to meet those needs. The social worker described the supervised visits as playful but not parental. During the visits, appellants ate and played games with Maria but there was little discussion about what Maria was doing. The supervised visits with Jessie and Octavio were much the same. The boys watched a cartoon during supervised visits.

At trial, father did not know what the children were doing or what classes they were enrolled in. Nor did father know that Maria was enrolled in school and taking ballet classes. Mother appeared to be unconcerned about Maria's needs, was detached with the boys, and told the boys to go to the teachers if they had problems. At one supervised visit, mother arrived 45 minutes late with junk food in disregard of Jessie's and Octavio's on-going struggle to lose weight and make healthy food choices.

Although the children love appellants and enjoy the visits, there is no evidence that the children would be greatly harmed if parental rights are terminated. Maria told the social worker that she loved her foster parents and wanted to be adopted. This was echoed in reports that Maria was closely bonded to her foster mother. The

supervised visits were playful but once the visits were over, Maria was ready to leave and would run to and hug her foster mother. Maria's behavior was the same at court.

Appellants' relationship with the boys was playful and loving, but not that of a parent. In the words of the trial court, "The parents [do] not demonstrate a current awareness of the needs of their children or what they're doing." The boys were told that if adopted, they might not see their family again. Octavio wanted to be adopted. Jessie told the social worker that he was not sure and wanted to think about it.

Father argues that the trial court looked at the parental benefit exception from the parent's point of view, not the child's. The trial found that the visits were loving and playful but lacked a significant, positive, emotional attachment from child to parent. (See e.g., *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The court found that "[b]eing a parent is more than giving birth, it's more than playing games, and telling the children that they're loved . . . . Being a parent is words and action; it's being a role model, it's being a guide, it's being a counselor, it's being a disciplinarian at times if needed, showing interest, putting the children before the parents' own needs at times, it's focusing on the needs of the children and not your own needs."

The benefits of a permanent and stable home are readily apparent. Maria is no longer a shy little girl afraid of "cops, police, or bad guys" but a happy, outgoing child who is excited about school and making new friends. Like Maria, the boys' medical and behavioral problems were fueled by appellants' drug abuse and neglect. After Octavio and Jessie were placed in the fost-adopt home, they made significant progress and no longer took medication. The record shows that the fost-adopt parents are bonded to Octavio and Jessie, are committed to meeting the boys' needs, and want to adopt

Appellants argue that the children should be placed in a guardianship, but that would deprive the children of the permanency and stability of a permanent adoptive home that they so badly need. Adoption is the preferred placement. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained

6

during periods of visitation with the parent. [Citation.]"  (*In re Angel B., supra,* 97 Cal.App.4th at p.466.)

*Sibling Relationship Exception*

To establish the sibling exception to adoption, appellants must show a significant sibling relationship, the termination of which would cause detriment to the child.  (*In re Celine R.* (2003) 31 Cal.4th 45, 54.)  The exception "focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings." (*Ibid*.)  The ultimate question is whether adoption would be detrimental to Maria, Jessie, and Octavio, not someone else.  (*Id.*, at p. 55.)  "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.  It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.]" (*Id.*, at p. 61.)

Maria, Jessie, and Octavio are part of a five-sibling group in which the older sisters, G. and Y., agreed to long term foster care and were placed with the grandmother.  Marie, Jessie, and Octavio are on a different track and have thrived in their respective fost-adopt placements.

Appellants argue that the older sisters have been a constant thread in the lives of Maria, Octavio, and Jessie and assumed the role of parents when appellants were unable to provide the children.  The evidence, however, shows that the children were neglected and at risk while living with G. and Y.  In 2008, G. told a social worker that she hated Maria and wanted to hurt her.  In 2012, after the family reunified, G. and Y. were drinking and defiant.  The trial court found there was no evidence that the children would suffer harm if the sibling relationship were severed.         "What I don't have is any psychological evidence, any expert evidence . . . concerning the detriment that the children would suffer if the sibling relationship was severed.  I'm left really in great part to speculate about the damage and that's just not sufficient."

7

Section 366.26 requires that a trial court balance the benefit of maintaining the sibling relationship against the benefit the child would derive from being adopted. Here, the court struck the balance in favor of adoption. This is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the [sibling] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*In re Bailey J.¸ supra,* 189 Cal.App.4th at p. 1315.) Appellants complain that the trial court did not make express findings on detrimental harm but those findings may be implied if the record supports them, as it does here. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793; see e.g., *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554-555 ["ample" evidence supported implied finding and result "obvious" from the record]; *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83-84 [substantial evidence "amply" supported implied finding].) Adoption is the preferred permanent plan and was clearly established by the social worker's testimony, the CWS and CASA reports, and Maria's and Octavio's statement that they want to be adopted. Jessie is unsure about adoption but is closely bonded to Octavio and his fost-adopt family.

Father argues that the trial court considered the unsworn testimony of the children's attorney who advised the court that Maria "wants her current caregiver to be her mommy." Counsel stated: "The boys want Maria to have what is best for her and what she wants. While it makes them sad to think about the possibility of not seeing her again, they agree that adoption is acceptable. . . . We went over that thoroughly and, as I said, it makes them very sad but they've been really clear with me." It is settled that the unsworn statements of counsel are not evidence and that counsel was required to state the children's wishes to the court. (§ 317, subd. (e)(2); *In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1541.) " 'Counsel for the child shall not advocate for the return of the child if, to the best of his or her knowledge, that return conflicts with the protection and safety of the child.' " (*Ibid.*)

"Here, as in many dependency cases, the case posed evidentiary conflicts. And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence.  As reflected in the juvenile court's ruling, the juvenile court considered the conflicting, competing evidence and essentially discounted [appellants'] evidence in concluding that [appellants] had failed to carry [their] burden of proof [on the parent-child and sibling exceptions to adoption].  It is not our function to retry the case."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Appellant's remaining arguments have been considered and merit no further discussion.

The judgment is affirmed

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

9

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Lori Siegel, under appointment by the Court of Appeal, for Appellant Mother.

Darlene Azevedo, under appointment by the Court of Appeal, for Appellnt Father.

Dennis Marshall, County Counsel. County of Santa Barbara, Toni Lorien Deputy County Counsel, for Respondent.