Filed 12/18/13  In re Gabriel D. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re GABRIEL D., DESTINY D., and XAVIER D., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B247942<br>(Super. Ct. No. J068018)<br>(Super. Ct. No. J068019)<br>(Super. Ct. No. J068020)<br>(Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JIMMY D. and DANIELLE D.,<br><br>        Defendants and Appellants. | |

Jimmy D. (father) and Danielle D. (mother) appeal from a March 13, 2013 order terminating their parental rights to Xavier D., Destiny D., and Gabriel D. and freeing the children for adoption.  (Welf. & Inst. Code, § 366.26.)[1]  Appellants contend that the beneficial parent-child and sibling relationship exceptions bar the children's adoption.  (§ 366.26, subd. (c)(1)(B)(i) & (v).)  We affirm.

*Facts and Procedural History*

On November 8, 2010 Ventura County Human Services Agency (HSA) filed a dependency petition for failure to protect Xavier D. (age 4), Destiny D. (age 2), and Gabriel D. (age 1) because appellants were using methamphetamine and neglecting

---

[1] All statutory references are to the Welfare & Institutions Code.

1

the children who had head lice and sleeping on mattresses covered with mold and urine. (§ 300, subd. (b).) The house had broken windows, was filled with trash and dirty clothes, and had cockroaches on the walls. Appellants could not afford natural gas for heating and cooking and the children had no food.[2]

At the December 9, 2010 jurisdiction/disposition hearing, the trial court sustained the petition and ordered home care and family maintenance services. On January 31, 2011, HSA reported that appellants were not returning phone calls and had not enrolled in outpatient drug treatment or parenting classes. The home was dirty and messy and still had no gas service for cooking, heating or bathing. Appellants' drug use and neglect had a toll on the children who suffered significant behavioral problems. Xavier was prone to hitting, screaming, crying, and temper tantrums. Destiny and Gabriel engaged in similar negative behaviors.

At the May 23, 2011 review hearing, the trial court continued services even though appellants were minimally participating in the case plan. Father tested positive for methamphetamine and skipped three tests. Mother failed four drug tests and failed to test on four other occasions. When the case worker visited the home, the children were unsupervised, running around, throwing things, and screaming and fighting.

On June 21, 2011, a section 387 supplemental petition was filed to remove the children because appellants were using drugs and neglecting the needs of the children. When HSA detained the children, appellants became enraged and yelled at the social worker and sheriff's deputies in front of the children. The half-siblings cried hysterically, refused to get into the van, and tried to run away. Half-sibling Jessie V. (age 13) climbed a tree and threatened to hurt himself as appellants yelled and screamed. The half-siblings were placed with the maternal aunt (Nickie Perez) who reported that father was always a

---

[2] The children's older half-siblings, Armando R., Alexis R., Jessie V., and Miranda V., were also detained. HSA reported that the Jessie's and Miranda's alleged father (Jesse V.) was in prison and had a criminal record for making terrorist threats, corporal injury to a spouse, dissuading a witness, and being under the influence of a controlled substance. Armando's and Alexis's alleged father was reported dead, a murder victim.

problem and verbally abusive. Perez stated that mother was not willing to spend time with the children and "always puts [her] husband in front of her children." The social worker agreed and reported that mother "continues to focus her attention on the father and not her children. . . . [M]other made it very clear that she will support [father] and stand behind him all the way."

At the section 387 detention hearing on June 22, 2011, appellants appeared in court and tested positive for amphetamine use. The trial court reprimanded appellants for causing a scene in front of the children. After the hearing, mother was arrested for being under the influence of a controlled substance and entered a drug diversion program.

At the July 18, 2011 jurisdiction/disposition hearing, the trial court sustained the section 387 supplemental petition and placed Xavier, Gabrielle, and Destiny in foster care. Destiny had to be moved to a different home because she was defiant and sexually acting out with Xavier. Although appellants maintained regular visitation, the children regressed when visitation was liberalized.[3] The children misbehaved, engaged in angry outbursts, and used foul language.

After mother completed an outpatient drug treatment program and counseling, appellants' financial situation deteriorated. Appellants were unemployed, lost their housing, and received food stamps. Mother complained that father was struggling with his substance abuse problem and not helping with the children. The case worker

---

[3] When visitation changed from supervised to monitored visits, Destiny had a major breakdown, kicking and biting HSA Field Base Case Aide Shantelle Young. Destiny yelled "I hate you" and called her a "bitch" several times. Growling like an animal, Destiny verbally abused Xavier and Gabrielle and cried all the way back to her foster home. On another occasion, Destiny took a little boy by the hand, cornered him, and kissed the boy on the mouth. When the foster mother said that it was inappropriate, Destiny replied, "No, it is ok! My Mommy said it was ok!" Destiny rarely talked about appellants between visits and called her foster parents "Mommy and Daddy." After visits, Destiny would tell Shantelle Young "to drive faster" because "I want to go home and eat dinner with my mommy and daddy now." Like Destiny, Gabriel was unruly during visits and excited about returning home to his foster parents.

3

reported that it was "chaos in the home" and appellants "constantly toss the children back and forth to each other."

At the 12 month review hearing on August 22, 2012, the trial court terminated services and set the matter for a contested permanent placement hearing. (§ 366.26.) The trial court found that father had not completed counseling or a substance abuse program and that mother lacked insight as to why her behaviors were detrimental to the children. The maternal aunt filed a section 388 petition for the childrens' long-term foster care, and appellants filed a section 388 petition to reinstate services and for long term foster care. The trial court denied the petitions for lack of a prima facie showing of change of circumstances.

At the contested 366.26 hearing, evidence was received that the children had made significant progress and were bonded to their foster families. Social Worker Jennifer Kamen testified that the foster parents were prepared to adopt the children and committed to addressing the children's behavioral problems. When asked if the children would suffer harm if parental rights were terminated, Kamen opined that the children would experience some sadness but, in recent months, had developed even stronger relationships with their foster parents, referring to them as "Mom" and "Dad." The trial court found that the children would not benefit from continuing the parent-child relationship and that the sibling relationship exception did not bar adoption.

*Standard of Review*

We review for substantial evidence and determine whether the trial court abused its discretion in finding that the parent-child and sibling exceptions were not significant enough to compel a permanent plan other than adoption. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) "Because a parent's claim to . . . an exception [to termination of parental rights] is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will chose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

4

*Beneficial Parent-Child Relationship*

To establish the parent-child exception, appellants must show they maintained regular contact and visitation and the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)  The existence of a beneficial relationship is determined by the age of the child, the portion of the child's life spent in parental custody, the quality of the interaction between parent and child, and the child's particular needs.  (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)  The parent must show "more than frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

Appellants' visits were frequent but lacked a meaningful parental relationship.  (*Ibid*.)  Before the children were removed, appellants used drugs and sequestered the children in a locked bedroom.  It had a profound effect on the children who engaged in sexually inappropriate behavior with bouts of screaming, hitting, cursing, and temper tantrums.  Xavier suffered from nightmares and hallucinations, was physically aggressive, and tried to strangle a child at school.  Destiny had problems lying and engaged in highly disruptive behavior.

Appellants did not progress beyond supervised visits and remained aloof from the children's education and psychological and medical needs. Doctor Tina Goodman-Brown, a clinical psychologist, reported that mother was overwhelmed by the children's behaviors and unable to stay calm when the children acted out.

The maternal aunt reported that the children act up when in appellants' presence and that appellants did not set boundaries or provide parental supervision.  In a video posted on Facebook, the children are out of control and hitting one another as mother dances about, oblivious to the fact that Destiny is attempting to run away.  Unsupervised visits were tried but proved to be detrimental to the children.  Xavier was angry and physically aggressive, threatened to kill himself and others, and engaged in sexual acting out behaviors.  The foster mother reported that it took "Xavier a couple of

days to settle down and return to his home routine after the unsupervised visits with his mother."

The trial court found that appellants "are more concerned about how they are perceived than dealing with the kids' issues. . . . [S]exual acting out, with children this young is really troubling . . . . I just can't imagine why I don't . . . see more concern expressed by the parents. I keep saying parents. Frankly, I see none from dad. No concern and no ability . . . to parent these children. Mom seems to have some ability, but she doesn't seem to quite get it. . . ."

Appellants speculate that the children suffer from separation anxiety but offered no evidence to support this claim. At trial, appellants denied the children had any behavioral problems or blamed it on the foster parents. Mother was in denial and did not ask about the childrens' medical and education needs or want to know who was providing services. When the social worker told mother that the older half-sibling (Jessie V.) had a heart problem, mother changed the subject and complained that father needed a toenail removed. The social worker testified that mother was more concerned about her relationship with father and "pretty much . . . chooses him over them." **(RT 101)~** Upon receiving a $2,400 child support refund, mother spent the money at shopping malls, on tattoos, and rented a car and disappeared with father for several days.[4]

This behavior was consistent with appellants' child welfare history which dates back to 2000 and includes 28 referrals for child abuse and neglect, sexual abuse, corporal punishment, domestic violence, substance abuse and drug overdoses, gang members in and out of the home buying and selling drugs, school truancy, maintaining a home with no water service or food, runaway children, self-mutilation by a sexually abused daughter, and children living in a home infested with cockroaches and head lice.

---

[4] It was money ill spent. Appellants were unemployed and homeless and had outstanding fines and assessments for driving without a current car registration ($359.62), transporting a child without a child passenger restraint ($662), driving without a license ($576.70), transporting a child without a child passenger restraint ($804.10), failure to use a child passenger seat on another occasion ($1,496.58), and drug diversion fees.

6

Appellants argue that the children should be placed in a guardianship but that would deprive the children of the permanency and stability of a permanent adoptive home they so badly need. There is no evidence that severing "the natural parent-child relationship would deprive the child[ren] of a *substantial* positive emotional attachment such that the child[ren] would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

*Sibling Relationship Exception*

Appellants' reliance on the sibling relationship exception is without merit. To establish the sibling exception appellants must show a significant sibling relationship, the termination of which would be detrimental to the child. (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) Appellants argue that the older half-siblings will be traumatized if the children are adopted. But that is not the test. The question is whether adoption would be detrimental to Xavier, Destiny, and Gabriel, not someone else. (*Id.*, at pp. 54-55.) The sibling relationship exception " 'only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.]" (*Id.*, at p. 61.)

The half-siblings are in their teens and live with the maternal aunt. Xavier, Destiny, and Gabriel are significantly younger and have little contact with them. Xavier has not seen the half-siblings since August 2012 and did not ask about visits. Destiny rarely mentioned the half-siblings. Gabriel was one year old when he was removed and knows little about the half-siblings. On one occasion, the foster mother and Gabrielle ran into half-sibling Alexis at the grocery store but Gabrielle did not recognize Alexis.

The foster mother confirmed that Xavier and Gabriel had not visited the half-siblings in months and exhibited behavioral problems at the last sibling visit. In May and July 2012, the maternal aunt reported that the half-siblings had no interest in visiting Xavier, Gabriel, and Destiny. When the social worker conducted home visits, the half-siblings did not bring up visitation unless the social worker discussed it. The trial

7

court concluded that the children's long-term emotional interests would be better served by the permanency of adoption. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1013.)

Appellants complain that the trial court failed to make express findings that severance of the sibling relationship would be detrimental to the children. Those findings may be implied where, as here, the record shows that termination of parental rights is in the best interests of the child. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793; see e.g., *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554-555 ["ample" evidence supported implied finding and result was "obvious" from the record]; *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83-84 [substantial evidence supported implied finding].)

Xavier, Gabrielle, and Destiny were young when the dependency petition was filed, lived briefly with the half-siblings, and have lived in foster homes for 20 months. There is no mention in the reports of a close relationship with the half-siblings, but that is no surprise. Before the children were removed, appellants often locked themselves up in a bedroom with the children while they did drugs and had sex. The maternal aunt (Perez) reported that the children did not have much of a relationship with the older siblings because appellants "kept the younger children pretty much in the crib all day locked up in a room with them so they wouldn't have to deal with them."

"Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.) That is the case here. The trial court balanced the benefit of maintaining the sibling relationship, which would leave the children in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption would confer. (*Id.*, at p. 191.) It was "a 'quintessentially' discretionary decision," and by no means a close call. (*In re Bailey J.¸ supra,* 189 Cal.App.4th at p. 1315.)

Appellants argue that the trial court injected an improper factor into the weighing process in finding that the prospective adoptive parents are amenable to sibling contact in the future. A trial court may not rely on "an unenforceable promise of future visitation by the child's prospective adoptive parents.' [Citation.]" (*In re C.B.* (2010) 190

Cal.App.4th 102, 128.)  Our Supreme Court, however, has noted:  "When appropriate, the court can encourage the adoptive parents to agree to visits among the siblings, although . . . it cannot require them to do so.  [Citations.]"  (*In re Celine R., supra,* 31 Cal.4th at p. 55.)

Adoption is the preferred permanent plan and was clearly established by the HSA reports and the testimony of the social workers, the foster mothers, and the maternal aunt.  "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'  [Citation.]  [¶] . . .  It is not our function to retry the case."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

The judgment (order terminating parental rights) is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.


9

Ellen Gay Conroy, Judge

Superior Court County of Ventura

_____

Matthew J. Thue, under appointment by the Court of Appeal, for Appellant Father.

Cristina Gabriellidis , under appointment by the Court of Appeal, for Appellant Mother

LeRoy Smith, County Counsel, County of Ventura and Alison Harris, Assistant County Counsel, for Rspondent.