Filed 5/22/15  Marriage of Lin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of GINA and AUGUSTIN A. LIN. | |
| GINA S. LIN,<br><br>    Respondent,<br><br>        v.<br><br>AUGUSTIN A. LIN,<br><br>    Appellant. | G049307<br><br>(Super. Ct. No. 10D001389)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Ronald Kreber, Judge.  Reversed.

Honey Kessler Amado and Kristin L. Smith for Appellant.

Law Offices of Saylin & Swisher, Brian G. Saylin and Lindsay L. Swisher for Respondent.

Augustin Lin appeals from a three-year domestic violence restraining order issued under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.)[1] upon an application filed by his former wife, Gina Lin, on behalf of the couple's three minor children.[2] Gina sought the domestic violence restraining order, while she had an order to show cause (OSC) to modify custody and visitation pending, following an incident in which Augustin struck one of the children on the head (rapping her with his knuckles) to get her attention when she was arguing and talking back to him. The Orange County Sheriff's Department investigated and concluded Gina's report of child abuse did not warrant referral to child protective services. The Orange County Social Services Agency (SSA) investigated and found the allegations of physical abuse unfounded and allegations of emotional abuse unsubstantiated. Nonetheless, the trial court concluded there was abuse warranting issuance of a three-year restraining order against Augustin. The domestic violence restraining order included personal conduct orders prohibiting him from hitting, striking, threatening, harassing, and disturbing the peace of the children, or contacting them by any means including telephone. It also included stay away orders, except as necessary for court-ordered visitation. At the same time, as both part of the domestic violence restraining order and in ruling on Gina's OSC to modify custody, the court awarded Gina sole legal and physical custody of the children but ordered Augustin would have extensive unmonitored visitation with them on weekends, during the week, and during school holidays, permitted him to attend school events and extracurricular activities, and allowed him to communicate with the children when he did not have them

---

[1] All further statutory references are to the Family Code, unless otherwise indicated.

[2] "As is customary in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect. [Citations.]" (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

2

for visits.  We agree with Augustin the trial court abused its discretion by issuing the domestic violence restraining order, and we reverse the order.

FACTS & PROCEDURE

Augustin and Gina were married in 1998.  The dissolution judgment entered in January 2011 awarded them joint legal and physical custody of their three minor children:  daughters C. (then age nine) and Ca. (then age seven); and son Connor (then age four).  Augustin had custody of the children every week from Tuesday after school until Thursday morning and alternate weekends (beginning Friday after school and ending with the custodial parent dropping the children off at school Monday mornings), with holidays and school breaks being divided between the parents.

In February 2012, Gina applied for and obtained a three-year domestic violence restraining order against Augustin protecting Gina, her fiancé, and his mother, due to confrontations taking place during custody exchanges.  Gina was awarded sole legal custody of the children, but Augustin and Gina continued to share physical custody.  In March 2012, Gina filed an OSC to modify custody and visitation, which was repeatedly continued.  The trial court appointed Dr. Russell Johnson to be the custody evaluator.

On June 5, 2013, Gina applied ex parte for a second domestic violence restraining order on behalf of the children—C. (now age 12), Ca. (now age 10), and Co. (now age six).  She alleged that on Saturday June 1, 2013, while the children were with Augustin for the weekend, Augustin hit C. on the head and verbally abused C. and Ca.

The incident apparently began when C. threw away cherries she believed were not edible, but which Augustin believed were still good.  Augustin later testified C. was talking back and arguing with him about the state of the cherries so he gave her a "'knuckle sandwich'" hitting her on the top of the head with his knuckles to get her attention telling her to stop arguing with him and to respect him.

3

Ca. texted Gina in the late afternoon that Augustin had been yelling at C. about being wasteful and disrespectful, and C. was crying. There was no mention of hitting. C. texted Gina that she had been recording Augustin on her cellphone and would show the recording to Gina later. When Gina picked the children up from school on Monday afternoon, the argument over the cherries was discussed, but there was no mention of hitting. That evening, when Gina was putting the children to bed, Ca., who did not witness the hitting event, told Gina that Augustin had "punched" C. in the head. Gina listened to the cellphone video recording Ca. had made (there was only audio—the video was distorted because Ca. was hiding the phone while she recorded). After listening to the recording, Gina woke C. to ask her what had happened. C. told Gina that Augustin hit her on the head during an argument and afterwards her head hurt and her head and face went numb and tingly. C. broke down crying telling Gina she was afraid to go back to Augustin.

A transcript of Ca.'s cellphone recording of Augustin's interaction with the C. after C. had gone to her room crying was attaching to the domestic violence restraining order application. It reads in relevant part:

"Oh you  . . . something. Get out of bed. I told you I could be mean. I told you guys that. Get to work.

"Tell me what you guys did at your mother's house. Tell me.

"Tell me what did she teach you guys. Except that you ____ mouth off to me.

"Now get up. Did you hear me? [C.] I will. Get up. I will. Don't you yell at me if you know what's good for you.

"(Mumbling [sic]. . . crying) What do you need her? She's doing her work. ___ [w]hat are you here for? Huh? Nothing. (Crying) I keep telling you the older you are the worse you are getting. Where the hell are you learning respect? Especially when I teach you things and you don't know things. (Crying) I am tired the

way you guys act right now.  The more time you spend over there the worse you get over there.  Alright teach you guys so you know better.

"Get up.  I will.  Now!  I told you don't get me mad.  Things could get worse.  Learn how to respect.  Learn how to talk to me right.  You're the oldest [C.] you should be leading by example.

"I get worse than that.  You remember that.  I'm tough.  Tougher than you guys—Find out how tough I am don't test me.  Just take my word for it.  I got hit harder than that when I was younger.  When you guys disrespect me ever again that's what you get from now on.  I keep telling you guys this.  I keep teaching you guys this.  You guys don't listen and you guys don't remember.  Maybe now you will remember and no way are you going to go back to your mother and tell her what I did.  It's not going to help you any because you guys have no discipline.  Your mother doesn't know how to discipline you guys.  How to raise kids the way that kids should be raised.  You understand me [C.]?  Yes.  I keep telling you don't disrespect me.  Listen to me.  I'm teaching you things.

"Get up!  Get up now before I hit you again.  Did you hear me?  Did you hear me [Ca.]?  (Panting)  Huh?  You think this is bad.  It could be worse.  You better watch yourself.  Don't think you're really good at what you do.  Do you hear me?  Yes.  Don't you ever disrespect me again.  You understand?  Yes.  What was that?  Yes.  What was that?  Yes.  What was that?  Yes.  What'd I say about yelling to me.  I said yes.  Huh?  I said Yesses.  (Crying) . . . ."

After talking to C., Gina called the police at 3:44 a.m.  She spoke with Orange County Sheriff's Deputy Ralph Naso who told her to come to the station to file a report.  Gina immediately took C. and Ca. to the station and filed a report.  Gina also contacted Ca.'s therapist.

Augustin's opposition to Gina's ex parte application asserted Gina filed the domestic violence restraining order application to gain advantage in the pending custody

5

evaluation and OSC re modification of custody. Augustin believed the hitting incident was nothing more than a "normal parenting" situation when the children were being rude, disrespectful, and mouthing off to him. Augustin declared that on Saturday evening, within a few hours of the incident, everything was resolved and they were all getting along well, and there were no issues the next day.

The court granted Gina's request for a temporary domestic violence restraining order protecting the three children, awarded Gina sole legal and physical custody of the children with no visitation for Augustin, and scheduled a hearing on the domestic violence restraining order application. A combined hearing on Gina's domestic violence restraining order application and her OSC re modification of custody and visitation began on July 17, 2013.

Deputy Naso testified for Augustin. He interviewed C. and Ca. when Gina brought them to the station. At the time of the interview (about 5:00 a.m.) the girls' dispositions seemed completely "normal," they did not have any visible injuries, and neither appeared to be fearful. Naso did not interview Augustin because he was not able to get in contact with him. Naso did not believe the incident warranted a referral to Child Protective Services (CPS), although it apparently was referred to CPS by Ca.'s therapist.

SSA social worker Nicole Strattman testified as to the results of SSA's investigation conducted by a different social worker. The investigating social worker interviewed the parents, the three children, and the girls' therapist Lori Breeden-Gomez. The allegations being investigated were that Augustin struck C. on her head and she felt numb and tingly afterwards. C. related to the social worker the incident began when she was cleaning some cherries, throwing those away she thought had mold on them. Augustin became angry with her and they started arguing, and he hit her on the head. Augustin was yelling at C. about being disrespectful and complaining he was upset Gina was not punishing C. C. related her head hurt and tingled for a few minutes. C. said it

6

was the first time Augustin had ever hit her—he usually gave long lectures as punishment. C. said the incident had made her fearful of seeing Augustin

Ca. told the interviewing social worker she heard C. say to Augustin that if he thought the cherries were still good, then he could "eat them out of the trash." Ca. did not see Augustin hit C.; but heard C. go upstairs crying and heard Augustin later admit that he had hit her. Ca. told the social worker that the year before this incident, Augustin had one time hit her on the head with an open hand. Ca. told the social worker she did not want to resume overnight visits with Augustin but was agreeable to daytime visits.

An emotional abuse allegation was added to SSA's investigation. The social worker interviewed therapist Breeden-Gomez. The therapist told the social worker Ca. has "child/parent" relationship issues they were working on. Both girls were very anxious about what was going to happen in court. C. was afraid Augustin would yell at them, felt she could not speak up because he would get angry and try to intimidate the girls, and afraid he would retaliate against them. Ca. was also worried about what Augustin would do. She told her therapist if Augustin enrolled in anger management classes, she was willing to have visits with him on alternate weekends, but she did not want to see him on weekdays because he refused to take them to their sports and other activities. The therapist opined neither girl was diagnosed with a mental disorder. The therapist said both girls had anxiety issues with Augustin, but she gave no indication as to what level of anxiety they had.

The social worker interviewed Augustin. He denied "hitting" C. He was trying to explain to her why the cherries were still good and she was arguing with him. He "tapped" her on the head with the back of his knuckles—what in his day was called "a quote,'knuckle sandwich'"— to get her attention when she was disrespectful to him. He admitted once hitting Ca. a year earlier after she hit her brother to show her that it was not okay to hit her brother. He denied cussing at or berating the children and said he only yells at them. The social worker described viewing/hearing the videotape on which

7

Augustin said things to C. like, "'Get up before I hit you again[;]'" "'Get up. You hear me[?] I told you I could be mean. Where the hell are you learning respect[;]'" and "'I'm tough. Tougher than you guys. When I was younger, I had it worse . . . don't test me. Take my word for it. I can hit harder than that if you disrespect me again.'"

The social worker interviewed Co., who said he saw Augustin "'smack[]'" his sister on the head with his knuckles closed and his thumb up. It was the first time Co. saw his father hit his sister. Augustin had never hit Co., and Co. said he missed Augustin and was not afraid of him.

Strattman explained that a social worker investigating abuse allegations can make findings the allegations are inconclusive (meaning there is insufficient evidence to prove if the allegations are true or not), unfounded (meaning the allegations are false or inherently improbable, or the incident could be accidental), or substantiated (more likely than not that child abuse or neglect occurred). Although the social worker's interview with C. revealed she was fearful of retaliation by Augustin, the social worker found the physical abuse of C. and risk of physical abuse to Ca. and Co. allegations unfounded, and the emotional abuse allegation as to C. and Ca. inconclusive. The case was closed.

Johnson testified and his custody evaluation report was admitted into evidence. Although Augustin has not included Johnson's report in his appellant's appendix, Johnson's recommendations were adopted by the court and attached to the domestic violence restraining order.

Johnson testified he interviewed the children on June 12, 2013, about the June 1, 2013, incident. C. described the force of the hit as a five or six on a scale of one to 10. Johnson agreed his report stated C. indicated her head felt fine later, the family went out to dinner and "things were fine and she was pretty good," and he did not get the impression C. had any injury "so I think she was okay." He listened twice to the recording of the incident, read the transcription of it, and discussed it with Augustin. Augustin acknowledged to Johnson the voice in the recording was his. Johnson

confirmed the girls were fearful of returning to Augustin's custody as a result of the incident—a "hit or tap" to C.'s head because it was a change in the kind of discipline he meted out—he had not hit before. Johnson explained the incident made the girls apprehensive about the style of discipline Augustin would use in response to their future behavior. Johnson did not believe the girls feared Augustin would "beat" them, but they were afraid he might hit them again because of his statements his own parents had done worse to him and he might do worse to them.

Johnson characterized the girls' apprehension about seeing Augustin as being "moderate." Johnson opined there were two components to the fear the girls expressed: The fact Augustin had hit C., which startled the girls, and his language afterwards saying worse might happen to them in the future. The two components made the girls feel threatened, "Like, 'I'm not sorry I did it and I might do that or worse again,' is what they took from that and I think that's where the anxiety came from." The girls did not know how to approach a resolution with Augustin. Johnson testified the girls' apprehension was about the kind of discipline they would receive from their father. He did not think there was a substantial risk of the children being exposed to domestic violence by being with their father. He testified the domestic violence risks were between the adults (Augustin, Gina, and Gina's fiancé) during custody exchanges based on "a couple of incidents in the past between the adults" which was why the exchanges now took place at school or another neutral location.

Johnson testified Augustin had anger management problems he would not acknowledge. He testified Augustin's actions were not "'normal parenting,'" because hitting a child on the head with a knuckle even lightly would hurt, and apparently it was painful to C. Johnson recommended Augustin get immediate counseling regarding his parenting style, which he described as an authoritarian style that lead to other issues with the children, and for Augustin and the children to work on their interaction and relationships. Otherwise, the incident could negatively impact the ongoing relationship

9

between the children and Augustin. Johnson recommended against stepped-up contact right away because the incident had just occurred and the children were still upset about it—he believed some period of counseling was needed to address the children's fears and concerns. However, Johnson also felt the children should resume contact with Augustin. Johnson believed it was in the children's best interest to have contact with Augustin "because, for the most part, things were all right between them, and [he] didn't want to abruptly disrupt that. Because I didn't think that—I thought that might send them the wrong message." Johnson believed changing the current custody schedule in accordance with his recommendations—with a reassessment in six months—was an appropriate way to handle it.

Johnson's recommendations (which were subsequently adopted by the court in full and are additionally discussed below), were that Gina have sole legal and physical custody of the children. He recommended the children maintain "frequent and continuing contact" with Augustin on a visitation schedule that included Augustin having the children for the first, third and fifth weekend of each month (from Friday evening through Monday morning), three hours on one weekday night each week; and holidays, birthdays, and school and summer vacations split between the parents.

Augustin testified and confirmed he told Johnson that he had hit C. in the dispute over the cherries. He gave her a "'knuckle sandwich'" on the head to get her attention—because she was not listening to him and was instead arguing with him. Augustin believed it was appropriate to hit C. at the time, and he admitted telling C. sometime after the incident that things could get worse and he might hit her again. He now realized hitting C. was not appropriate. Augustin testified he would not tap or hit in the future. When asked if he would threaten to hit, he replied, "It's hard to say what's going to happen tomorrow. But will I intend to? No."

Augustin testified that after the incident, he and the children had a "family meeting" to discuss and resolve the issues. He gave the girls the option of going back to

10

Gina's, and they declined. After dinner that night, the family played a board game, and the children were normal. On Sunday, everyone was happy and fine and there were no lingering issues.

Gina testified that since the temporary domestic violence restraining order was issued, the children were in her care and custody, and had not had visits with Augustin. She observed the girls were fearful of Augustin and apprehensive about seeing him. Gina was aware Augustin had offered to let the girls return to her house after the hitting incident and they declined. She believed they declined because they did not want to say in front of Augustin that they were afraid of him.

Gina testified both girls were in therapy and still had fear of returning to Augustin, feared retaliation by him, and both had devised a "safety plan" with their therapist. She conceded Co. did not express any fear of Augustin and he was not in therapy. Gina testified Co.'s lack of fear did not make her rethink the girls' anxiety because Co. did not get the same type of discipline from Augustin as the girls. Gina testified that around the time Ca. was born, Augustin had pushed her down and punched her in the arm.

Gina was in agreement with Johnson's custody evaluation and his recommendations about Augustin's visitation including they would be with him the first, third, and fifth weekend of every month and have a midweek visit. She felt it was important for the children to maintain their relationship with Augustin. She believed, however, the girls resumed visits should be "eased into" or possibly monitored at first.

*Ruling*

On July 19, 2013, the court found, by a preponderance of the evidence, Augustin was the perpetrator of domestic violence and found there was apprehension or fear that was rational. The court stated there was threatening behavior and the children's fear was real. While observing Augustin was probably "a very, very good person and probably a very good parent, but he comes from a different background, and it's just not

11

going to work in our day and age. He might be correct, but it's not accepted, and it puts too much stress on the children." The court further commented to Augustin "you and I may have been treated the way your parents treated you, but that's different. We've got to deal with what we have today, and there's too much evidence about distress the children have. They should not have stress. It's just too short a time period to go through that a young person has stress. So we can't have that." The court commented the children and Augustin needed to remain in therapy. The court stated it would adopt Johnson's report and recommendations, and specifically stated it would not consider ordering a monitor for Augustin's visits with the children. However, the court wanted to make sure the resumed visits got "started on the right foot" so before he could begin having the children for the first, third, and fifth weekends of the month, Augustin needed to complete two therapy sessions.

The court issued a three-year domestic violence restraining order against Augustin with C., Ca., and Co. as the protected persons. The personal conduct portion of the domestic violence restraining order enjoined Augustin from hitting, striking, threatening, harassing, and disturbing the peace of the children, or contacting them by any means (including telephone). The exception of peaceful contact for court-ordered visitation was not included in the personal conduct portion of the domestic violence restraining order. The stay-away order portion of the domestic violence restraining order, ordered Augustin to stay 100 yards away from the children's residence and school, except for peaceful contact as required for court-ordered visitation. The domestic violence restraining order, however, also specifically permits Augustin to be present at the children's extracurricular school activities. The court's domestic violence restraining order adopted Johnson's specific recommendations pertaining to custody, visitation, and therapy. Gina was granted sole legal and physical custody of the children, with Augustin being allowed unmonitored visitation after completing two sessions of therapy as follows: the first, third, and fifth weekend of the month (Friday evening through Monday

morning), three hours on one weekday night each week; and holidays, birthdays, and school vacations would be split between the parents. The visitation portion of the order allows the children to communicate freely with the non-residential parent at the children's discretion, and each parent may have one evening telephone call with the children on days he or she does not have them. The court ordered an updated child custody evaluation be conducted in six months. The court denied Augustin's subsequent request for a statement of decision.

On September 18, 2013, the court entered its findings and order on Gina's OSC re modification of custody and visitation (hereafter the custody modification order), which was consistent with the domestic violence restraining order. The custody modification order directed that Augustin "shall not use corporal punishment in disciplining the children[,]" and his unmonitored parenting time would begin after he completed two therapy sessions. The custody modification order specified Augustin would remain bound by the provisions of the domestic violence restraining order, but his "peaceful contacts as provided in [the custody modification order were] excepted from the provisions of the [domestic violence restraining order]." Augustin filed his notice of appeal from the July 19, 2013, domestic violence restraining order on November 15, 2013. He has not appealed the custody modification order.

DISCUSSION

Augustin contends the trial court abused its discretion by issuing a three-year domestic violence restraining order under the DVPA. We agree.

The purpose of the DVPA "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) To that end, a trial court may issue a restraining order under the DVPA upon "reasonable proof of a past act or acts of abuse." (§ 6300.)

13

Section 6203, subdivision (a), defines "abuse" as "any of the following: [¶] (1) Intentionally or recklessly to cause or attempt to cause bodily injury[;] [¶] (2) Sexual assault[;] [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[;] [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [s]ection 6320." (§ 6203.)[3]  The behaviors outlined in section 6320 include "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in [s]ection 528.5 of the Penal Code, falsely personating as described in [s]ection 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a).)

Pursuant to section 6300, a domestic violence restraining order may be issued upon reasonable proof based on a preponderance of the evidence of past act(s) of abuse.  (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137 (*Gdowski* ).)  The trial court has broad discretion in determining whether to grant a domestic violence restraining order.  (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420-421 (*Gonzalez*).)

---

[3]  The current version of section 6203, which became effective after this domestic violence restraining order was issued, amended section 6203 to renumber former subdivisions (a) through (d), as subdivisions (a)(1) through (a)(4), and to add a new subdivision (b), that reads, "Abuse is not limited to the actual infliction of physical injury or assault." (Stats. 2014, ch. 635, § 2.)  The new subdivision (b) is consistent with existing case law concerning the definition of abuse under the DVPA (see e.g., *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1496 (*Nadkarni*) [to constitute abuse under the DVPA, conduct "'need not be actual infliction of physical injury or assault.' [Citation.]  To the contrary, section 6320 lists several types of nonviolent conduct that may constitute abuse within the meaning of the DVPA . . . ."]), and the addition of that subdivision does not affect our analysis.

14

Accordingly, we review the trial court's grant of a restraining order for abuse of discretion, which occurs only if the court's ruling exceeds the bounds of reason, fails to apply correct legal standards, or is without substantial support in the evidence. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264-1265 (*S.M.*) ["'[j]udicial discretion to grant or deny an application for a protective order is not unfettered'"]; see *Gonzalez, supra,* 156 Cal.App.4th at p. 420.)

When the parties do not request findings of fact, we assume the trial court made the factual findings necessary to sustain its order. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded by statute on another ground as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).) We review the court's express and implied factual findings for substantial evidence. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1046, fn. 4; *Fladeboe, supra,* 150 Cal.App.4th at p. 59.)

We conclude that issuance of a three-year domestic violence restraining order against Augustin as to his children exceeded the bounds of reason and, thus, was an abuse of discretion. The evidence of abuse under the DVPA is lacking and, more significantly, issuance of the restraining order was completely inconsistent with, and in conflict with, the custody and visitation orders made at the same time.

As to the evidence of abuse, section 6203, subdivision (a)(1), requires evidence of intentionally or recklessly causing or attempting to cause bodily injury. The undisputed evidence is that Augustin used corporal punishment on C.—the first time such punishment had ever occurred with C.—in response to her arguing with him about whether the cherries were edible and her telling him he could eat them out of the trash if he thought they were still good. It is undisputed Augustin hit C. on the head with the back of his knuckles and it caused brief transitory and short-lived pain—her head felt numb and tingly for a few minutes. She had no physical injury—no bump, knot, or bruise—resulting from the single hit. Deputy Naso interviewed C. and Ca. about the

15

incident. He found the girls had perfectly normal demeanor, C. had no visible injury, and he concluded the incident did not warrant further investigation. The investigating social worker found the physical abuse and risk of physical abuse allegations unfounded. The custody evaluator agreed C. had no injury.

Section 6203, subdivision (a)(3), also allows a finding of abuse if the children were placed in reasonable apprehension of *imminent serious bodily injury* from their father. Here, the youngest child, Co., expressed absolutely no fear or concern about being with his father, missed him and wanted to resume visits. (See *In re C.Q.* (2013) 219 Cal.App.4th 355, 364 [abuse of discretion to include children as protected persons in mother's restraining order absent evidence indicating their safety might be in jeopardy absent their inclusion in restraining order].) Although the girls expressed fear of seeing their father, there is no evidence it was reasonable fear of imminent serious bodily injury, as opposed to apprehension and anxiety about the level of disciple he might use in the future. Johnson testified the girls did not express fear Augustin would "beat" them, but they were afraid he might be angry with them and might use harsher punishment in the future than he had in the past. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 251 [permissible use of reasonable corporal discipline by parent].) Despite expressing some anxiety, Ca. indicated she wanted to resume visits on the weekends. She did not want weekday visits because they interfered with her extracurricular activities. [4]

Gina argues Augustin's conduct falls within section 6202, subdivision (a)(4) ["behavior that has been or could be enjoined pursuant to [s]ection 6320]" because he hit C.—something he had never done before—and, during the argument threatened he might use corporal punishment in the future if she continued to argue and disrespect him, and thus he "disturb[ed] the peace of the [children]" by making them fearful of him.

---

[4]    Section 6203, subdivision (a)(2) [sexual assault], is inapplicable.

16

In *Nadkarni, supra,* 173 Cal.App.4th at page 1497, the court explained "'disturbing the peace of the other party'" as used in section 6320 "may be properly understood as conduct that destroys the mental or emotional calm of the other party." In *Nadkarni*, the wife made a facially sufficient showing of abuse within the meaning of the DVPA by alleging her former husband had destroyed her mental or emotional calm by "accessing, reading, and publicly disclosing the content of [her] confidential e-mails." (*Nadkarni, supra,* 173 Cal.App.4th at pp. 1498-1499.)

In *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140 (*Burquet*), after plaintiff broke up with defendant, and despite her repeated requests he leave her alone, defendant kept contacting plaintiff beseeching her to renew their intimate relationship and would become angry when she turned him down. When he showed up unannounced at her residence, he became angry when she would not let him in and told him to leave. Plaintiff became fearful as to what defendant might do because on two prior occasions during their relationship when he had gotten angry he became physical with her. (*Id.* at pp. 1142-1143.) The appellate court found the facts sufficient to support the trial court's finding defendant disturbed the peace of plaintiff and thus committed an act of "'abuse'" under the DVPA. (*Id.* at p. 1147.)

But unlike *Nardkarni* and *Burquet*, the fear and emotional upset in this case is about parenting style and discipline. As Johnson testified, Augustin had an authoritarian parenting style that led to issues in his relationships with the children. He testified the "moderate" apprehension the girls had about Augustin pertained to the kind of discipline they might receive in the future. They were apprehensive because Augustin had not used corporal punishment in the past—he disciplined them by lecturing them. And although Ca. and Augustin both reported that a year earlier he one time hit Ca.— there is absolutely nothing in the record as to the circumstances or severity of that incident. Here, in ruling, the trial court underscored its decision was more about disapproval of Augustin's authoritarian parenting style and the stress it placed on his

17

daughters, than about concerns of domestic violence. The court emphasized its belief that Augustin was most likely "a very, very good person and probably a very good parent," but that "he comes from a different background, and it's just not going to work in our day and age. He might be correct, but it's not accepted, and it puts too much stress on the children."

As Augustin points out, the terms of the domestic violence restraining order itself underscore that its issuance was an abuse of discretion. Gina does not address this argument. Although a trial court is not required to find there is a probability of future domestic violence before issuing a domestic violence restraining order under section 6300 (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 783), the purpose of a domestic violence restraining order is to prevent a recurrence of domestic violence and ensure a period of separation between the parties. (§ 6300.) Augustin points out the domestic violence restraining order does virtually nothing in this regard.

*S.M., supra,* 184 Cal.App.4th 1249, is instructive. In that case, the trial court found abuse and issued a domestic violence restraining order following an argument between mother and father in which he repeatedly badgered her about not taking their child out of state, which caused mother to become afraid. (*Id.* at p. 1262.) In its comments upon ruling, the trial court also stated it did not believe father was in any way inappropriate for custody or visitation with the child, and thus the restraining order was not the "*kind*" that would invoke the section 3044 presumption against awarding custody to a parent who had been found to have perpetuated domestic violence against the other parent. (*Id*. at p. 1262.) The appellate court found the evidence sufficient to support the finding of abuse. The appellate court further found "[t]he trial court's attempt to limit the legal effect of the restraining order further illustrates that the issuance of the order was an abuse of discretion." (*Id.* at p. 1266.) The trial court's comments suggested it "did not believe that the facts of this case supported issuing a restraining order under section 6300." (*Id.* at p. 1267.) Because a finding of abuse "sufficient to support a

18

DVPA restraining order necessarily triggers the presumption in section 3044. By stating that, in its view, the presumption of section 3044 should not be imposed against [father], the trial court suggested that the court was *not* making a finding of domestic violence sufficient to trigger the presumption. If the court did not intend to make a finding that [father] had committed an act of domestic violence sufficient to trigger the presumption of section 3044, then the court could not have found that [father] had engaged in domestic violence sufficient to support issuance of a restraining order under section 6300." (*Id.* at pp. 1267-1268.)

Courts are "encouraged" not to make custody or visitation orders that are "inconsistent with" any restraining order. (§ 3031, subd. (a); 6223.) Here, the restraining order's inconsistency with visitation order contained therein in terms of achieving the purposes of a domestic violence restraining order support the conclusion issuance of the domestic violence restraining order was an abuse of discretion. The court issued a *three-year* domestic violence restraining order against Augustin with his children as the protected persons. In the personal conduct portion of the form domestic violence restraining order, Augustin is required to refrain from hitting, striking, threatening, harassing, and disturbing the peace of the children, or contacting them by any means (including telephone). The stay-away portion of the form domestic violence restraining order orders Augustin to stay 100 yards away from the children's residence and school, except for peaceful contact as required for court-ordered visitation. But at the same time, the court also ordered that Augustin may be present at the children's extracurricular school activities and it adopted *all* of the custody evaluator's recommendations pertaining to custody, visitation, and therapy. Although Gina was granted sole legal and physical custody of the children, Augustin was given extensive *unmonitored* visitation with the children contingent only upon his first completing two therapy sessions. The prior custody order had gave Augustin parenting time every week from Tuesday after school until Thursday morning, alternate weekends (Friday after school until Monday morning),

19

with holidays and school breaks being divided between the parents. The new visitation order allows Augustin to have the children, unmonitored, the first, third, and fifth weekend of the month (Friday evening through Monday morning), three hours on one weekday night each week; and holidays, birthdays, and school vacations would be split between the parents. Moreover, although the personal conduct portion of the domestic violence restraining order prohibits Augustin from contacting the children, the visitation portion of the order allows the children to freely initiate communication with the non-residential parent, and allows Augustin to telephone the children on his non-visitation days.

The inherent inconsistency between issuing a three-year domestic violence restraining order against Augustin as a result of the incident, while issuing visitation orders giving him extensive completely unmonitored continuing parenting time, compel the conclusion issuance of the domestic violence restraining order was an abuse of discretion. While we do not condone Augustin's action in response to his daughter's behavior, the concerns arising from the incident were better handled by way of the order modifying custody and visitation. We observe our reversal here pertains only to the July 19, 2013, domestic violence restraining order. The trial court's subsequent order ruling on Gina's OSC re modification of custody and visitation was not appealed. Thus, as a practical matter, custody and visitation remain unaffected by our ruling.

20

DISPOSITION

The trial court's July 19, 2013, restraining order is reversed.  Appellant is awarded his costs on appeal.

O'LEARY, P. J.

I CONCUR:

MOORE, J.

BEDSWORTH, J., Concurring:

"Pursuant to [Family Code] section 6300, a domestic violence restraining order may be issued upon reasonable proof based on a preponderance of the evidence of past act(s) of abuse.  (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137 (*Gdowski*).)  The trial court has broad discretion in determining whether to grant a domestic violence restraining order.  (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420-421 (*Gonzalez*).)  Accordingly, we review the trial court's grant of a restraining order for abuse of discretion, which occurs only if the court's ruling exceeds the bounds of reason, fails to apply correct legal standards, or is without substantial support in the evidence.  (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264-1265 (*S.M.*) ["'[j]udicial discretion to grant or deny an application for a protective order is not unfettered'"]; see *Gonzalez, supra,* 156 Cal.App.4th at p. 420.)"  (Maj. opn., p. 15.)

"[Family Code] section 6203, subdivision (a), defines 'abuse' as 'any of the following: [¶] (1) Intentionally or recklessly to cause or attempt to cause bodily injury[;] [¶] (2) Sexual assault[;] [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[;] [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [s]ection 6320.  [Fn. omitted.]'  The behaviors outlined in [Family Code] section 6320 include 'molesting, attacking, *striking*, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in [s]ection 528.5 of the Penal Code, falsely personating as described in [s]ection 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of

1

the court, on a showing of good cause, of other named family or household members.'

([Fam. Code,] § 6320, subd. (a).)" (Maj. opn., p. 14., italics added.)

So under Family Code section 6203, subdivision (a)(4), any conduct that could be enjoined under Family Code section 6320 qualifies as abuse. Family Code section 6320 provides that striking can be enjoined. All parties agree Augustin struck C., enjoinable conduct which therefore qualifies as abuse. That seems to me – at least according to the letter of the law – to support a domestic violence restraining order. I am therefore unable to join in an opinion that finds an abuse of discretion in issuance of a domestic violence protective order on the facts of this case.

But I can find an abuse of discretion in issuing such an order and then granting the restrained party unmonitored visitation with the child who's been struck. I agree with my colleagues that this part of the order is inherently inconsistent. (See *S.M., supra,* 184 Cal.App.4th 1249.) I can only conclude the trial judge had one of those moments of disconnect that afflict us all. On that basis, I join in my colleagues' conclusion the court's order must be reversed.


BEDSWORTH, J.


2